IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

ANDRE BOILEAU,

    Plaintiff,

        v.                                    CIVIL NO. 12-1550 (JAG/CVR)

PONCE SCHOOL OF MEDICINE,

    Defendant.

## REPORT AND RECOMMENDATION

## INTRODUCTION

Plaintiff Andrew Boileau ("Plaintiff" or "Boileau") filed this suit seeking damages for the Ponce School of Medicine's ("PSM") alleged breach of his employment contract. He also seeks redress under Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 § 5141 for damages resulting from PSM's negligence.

On July 31, 2014, PSM requested judgment be entered in its favor on two (2) grounds, to wit: that PSM fulfilled all of its duties and responsibilities under the terms of Plaintiff's employment contract and, thus, Boileau cannot establish a cause of action for breach of contract; and Boileau cannot establish a cause of action for damages under article 1802. (Docket No. 28). On August 20, 2013, Plaintiff filed his opposition. (Docket No. 35). PSM replied. (Docket No. 41). These motions were referred to the undersigned for a Report and Recommendation. (Docket No. 41).

For the reasons stated below, and upon careful consideration of the parties' submissions and applicable law, it is recommended that PSM's Motion for Summary Judgment be **GRANTED**.

## RELEVANT FINDINGS OF FACT

The record in this case confirms that Plaintiff and PSM agree on most of the facts. More specifically, the following uncontested facts were admitted by Plaintiff: 1-28, 31-36, 38-41, 49, 52-53, 55-62, 64 and 67-70. Thus, the uncontested facts are as follows:

PSM is a private medical school, founded in 1977 and located in Ponce, Puerto Rico. The school is accredited by the Liaison Committee on Medical Education, and classified as a United States Medical School and holds nationally accredited graduate programs in the disciplines of Medicine, Clinical Psychology (Psy.D. and Ph.D.), Biomedical Sciences, and Public Health. PSM's Statement of Uncontested Material Facts ("SUM") ¶¶ 1-3.

In 1987, Plaintiff obtained a Bachelor of Science in Biochemistry from the University of Wisconsin-Madison. In 1995, he graduated with a Ph.D. in Neuroscience also from the University of Wisconsin-Madison. After his Ph.D., Boileau served as a post-doctoral trainee and as an Associate Scientist in the Department of Physiology at the University of Wisconsin-Madison from 1995 to 1997 and from 2001 to 2007, respectively. SUM ¶¶ 4-6.

In 2007, Boileau began seeking a full time professorship position where he could both teach and do research. Around that same time, Boileau saw a posting for a position at PSM on a bulletin board at the University of Wisconsin-Madison and he wrote to PSM to express his interest in the position. Following Boileau's letter of interest, Boileau visited PSM where he met and interviewed with Dr. Raúl Armstrong, former president at PSM, Dr. José A. Torres, Associate Dean of Research and Director of Graduate Studies at PSM at the time, and several other professors. SUM ¶¶ 7-8 and 12.

On July 2, 2007, PSM sent Boileau a first offer for an academic position in the Department of Physiology and Pharmacology. The July 2, 2007 offer included, among other things, the following terms and conditions:

1. A two-year (24 month) appointment to serve as Associate Professor and Director of the Neuroscience Center;

2. A salary of $65,000.00 ($45,000.00 guaranteed institutional salary, $9,000.00 assigned as Director of the Neuroscience Center and $11,000.00 of additional compensation for two years on recruitment);

3. 400 square feet of lab space furnished with basic research equipment;

4. Office Space; and

5. Start up funds (seed money) of $50,000.00 evenly distributed throughout the first two years of his recruitment. SUM ¶ 13.

The offer stated that, as a faculty member at PSM, Boileau was "expected to significantly contribute to [the school's] three-fold mission: research, teaching and service/administration. It also provided that Boileau was "expected to publish regularly in well-recognized peer-review journals and to serve as a research mentor to Ph.D. students in the Biomedical Research Program, M.D. students, and post-doctoral fellows." SUM ¶¶ 14-15.

Boileau was also "required to actively seek and obtain external funding, from federal as well as non-federal sources, so [he could sustain his] research activities...". SUM ¶ 16.

Because the July 2, 2007 offer only provided Boileau with $50,000.00 of seed money total for the two year appointment ($25,000.00 per year), and Boileau understood it should be $50,000.00 per year, he sent a correction request. SUM ¶ 17.

Boileau and PSM engaged in negotiations as to the economic terms of the contract and on August 24, 2007, PSM sent Boileau a modified offer detailing new terms and conditions. SUM ¶ 18. PSM's August 24, 2007 offer to Boileau reiterated items 1 and 3-5, but modified the salary provision to include a salary of $75,000.00 ($45,000.00 institutional salary, $10,000.00 to serve as the Director of the Neuroscience Center and $20,000.00 in additional compensation for two years on recruitment). This offer, however, restated that Boileau was expected to publish regularly in well-recognized peer-review journals and to actively seek external funding; requirements that Boileau never objected to. The August 24, 2007's offer also stated that, if Boileau was "unable to obtain additional income from grants by the end of the second year, PSM would be willing to offer a second two year contract based on the recommendations of the Chair of the Department of Physiology/Pharmacology and the Associate Dean of Research." SUM ¶¶ 18-19.

Thus, the offer indicated that, if Boileau was unable to get income from grants after he concluded his first two-year contract, the school was willing to offer a second-year contract but that reappointment was *conditioned* on the recommendation of the Chairman of the Department of Psychology/Pharmacology and the Associate Dean of Research. SUM ¶ 22.[1]

---

[1] The offer specifically stated: "[i]f you are unable to obtain additional income from grants by the end of the second year, PSM will be willing to offer you a second two year contract based on the recommendations of the Chair of the Department of Physiology/Pharmacology and the Associate Dean of Research. This second two year contract will include a limited extension of the $20.000 annual incentive for one year or until you obtain a similar amount of income from grants within that first year." Docket

As Plaintiff candidly admits, there was no commitment by PSM to extend his appointment unless it had the approval of the Chair of the Department of Physiology/Pharmacology and the Associate Dean of Research. SUM ¶ 23.

Following the August 24, 2007 offer, Boileau sent Dr. Armstrong a request for further negotiations as to his seed money amount. All the negotiations of his contract were as to economic terms and Plaintiff never raised any objection as to the fact that he was required to actively seek and obtain external funding, from federal as well as non-federal sources, so he could sustain his research activities or as to the requirement that he was expected to publish regularly in well-recognized peer-review journals, as he was in agreement with these requirements. SUM ¶ 24-25.

On November 14, 2007, PSM sent Boileau another letter clarifying some of the terms of the August 24, 2007 offer. SUM ¶ 26. Specifically, the November 14, 2007 letter corrected item 7 of the August 24, 2007 offer letter regarding seed money to read as follows: "[i]n relation to seed money and laboratory facilities, we can offer a maximum of $50,000.00 annually for two years to run your laboratory and pay for a technician salary." Id.

Boileau signed PSM's November 14, 2007 offer letter and began working as Associate Professor in the school's Physiology and Pharmacology Department and as Director of the Neuroscience Center at PSM on January 16, 2008. SUM ¶ 27.

As per Boileau's employment contract, PSM paid Boileau the $45,000.00 institutional salary; $10,000.00 to serve as the Director of the Neuroscience Center; and

No. 28-7, Exhibit V at ¶ 3.

$20,000.00 in additional compensation upon Boileau's arrival at PSM. SUM ¶ 28. Boileau was provided with 400 square feet of lab space of located on the first floor of the Research building and was assigned to Office No. 106.[2] SUM ¶ 29

Moreover, as of November 2009, Boileau had received $75,784.18 of the $100,000.00 of seed money available to him under his employment contract. SUM ¶ 30 and the Accounting Report of Boileau's seed money expenditures in support thereto.[3]

The RFIP Grant

As part of the American Recovery and Reinvestment Act ("ARRA"), enacted by the 111th United States Congress in February 2009, $10 billion in funds were directly allocated to the National Institutes of Health ("NIH") to provide support for the construction of new research and educational facilities as well as groundbreaking scientific research that would improve the health of the nation.  SUM ¶ 31.

Among the projects funded by the NIH following the ARRA legislation, was the Extramural Research Facilities Improvement Program ("RFIP"). SUM ¶ 32. The RFIP awards granted public and nonprofit private entities funds to expand, remodel, renovate, or alter existing research facilities or construct new research facilities to be used to conduct biomedical and behavioral research. Id.

---

[2] Plaintiff's qualifications because "he repeatedly asked for a refrigerator" and "was never provided" do not contest this fact.

[3] Although Plaintiff denied this proposed statement, he failed to adequately support his denial by a record citation as required by Local Rule 56(e). For example, Plaintiff makes reference to four (4) pages of his deposition that were allegedly included in Exhibit II of PSM's Statement of Uncontested Fact. A careful review of said Exhibit confirms that it does not include pages 49, 50, 91 or 92.  Similarly, Plaintiff's reference to PSM's Exhibit 24 is inapposite as there is no Exhibit 24.  The same is true with respect to the remaining supporting documents, as none of them support his contention.  Thus, this statement is deemed admitted. It is not the court's job to glean the parties' positions and make and independent analysis of all the pages submitted by Plaintiff in support of her Opposition.  This is ". . . exactly the sort of archeological dig that anti-ferret rules are designed to prevent." Puerto Rico American Ins. Co. v. Rivera-Vázquez, 603 F.3d 125, 131 (1st Cir. 2010) (reiterating also that Local Rule 56 is "aimed at enabling a district court to adjudicate a summary judgment motion without endless rummaging through a plethoric record.")

Soon after ARRA's enactment, it was decided that PSM would apply for a RFIP grant in order to remodel and expand an unused building of approximately 7,000 square feet to house the PSM's new Neuroscience Center. SUM ¶ 33.

Accordingly, a committee of professors was impaneled to put together and submit the RFIP grant proposal to build PSM's Neuroscience Center.  The members of the RFIP grant proposal committee were: Boileau, Dr. Torres, Dr. James Porter, Associate Professor and Principal Investigator for the Department of Pharmacology at PSM; Julio Montalvo, Facilities Director at PSM; Dr. Kenira Thompson, Assistant Professor and Principal Investigator for the Department of Physiology; Dr. Summer Acevedo, Assistant Professor in the Department of Physiology and Psychology; and Claris Vega, Office of Sponsor Research, Projects Programs Director. SUM ¶ 34. Plaintiff volunteered to spearhead PSM's application for the RFIP grant to remodel the building to be used as the Neuroscience Center. SUM ¶ 35.

According to the RFIP's guidelines, the funds requested could range from $2M to $15M for a period not to exceed five years. SUM ¶ 36. The due dates for the grant applications were set in accordance with the amount requested: **May 6, 2009,** (for projects between $2M and $5M); **June 17, 2009**, (for projects between $10M and $15M); and **July 17, 2009**, (for projects between $5M and $10M). SUM ¶ 36.

PSM's strategy was to apply for the grant award with the lesser amount because the committee believed the school had a better chance at obtaining a smaller grant award rather

Andre Boileau v. Ponce School of Medicine
Civil No. 12-1550 (JAG/CVR)
Report and Recommendation
Page 8

than competing against other larger institutions for the larger grant money awards. Thus, the deadline to submit the RFIP grant proposal was May 6, 2009.[4]  SUM ¶ 37.

As part of the RFIP grant application process, applicants were to submit architectural plans for the remodeling, renovation or expansion of the institute in question, including architectural compliance with a number of federal regulations. SUM ¶ 38. Additionally, as part of the application, PSM was required to provide evidence of compliance with the grant's green design and sustainability requirement as well as statistics as to the number of jobs that would be created as a result of the award, among others. Id.

Therefore, PSM hired the services of Bonin Orozco Arquitectos ("Bonin") to design and create the architectural plans for the remodeling and expansion of the Neuroscience Center. SUM ¶ 39.

Bonin created the plans to be used by PSM in its RFIP application on a pro bono basis with the understanding that, if PSM received the grant, it would hire Bonin to build and remodel the Neuroscience Center. SUM ¶ 40.

Fernando Bonin, one of the architects at Bonin, attended several meetings at PSM and held numerous conversations with members of the RFIP grant committee in order to create the plans in time to meet the May 6, 2009 deadline. SUM ¶ 41.

---

[4] Although Plaintiff did not deny or admit this statement, it argues that PSM's strategy was to try *first* for the May 6 deadline. Plaintiff's qualification is belied by his own deposition testimony submitted by PSM in support of this statement.  Accordingly, this statement is deemed admitted. He also refers to Dr. Kenira Thompson's Unsworn Statement (Docket No. 28-12, Exhibit X) which is 4 pages long and includes 18 statements without pointing out a specific portion of those pages to support his opposition, as mandated by Local Rule 56(e).

On Friday, May 1, 2009, Bonin provided PSM with the completed architectural plans.[5] SUM ¶ 42.

In the end, Boileau failed to put together the entire grant by the grant deadline.[6] Thus, PSM did not submit the RFIP grant application by the May 6, 2009 deadline.   SUM ¶ 45.

During the two years he served as Associate Professor at PSM, Boileau did not publish any papers related to his research at PSM in peer-review journals.  SUM ¶ 46.[7]  In addition, Boileau was not able to secure any funding.  During his time at PSM, Plaintiff only submitted one grant to the NCRR/RCMI Pilot Project Supplement, which he did not obtain.[8] SUM ¶ 47.

Section 2.11.1 of PSM's Faculty Regulations Manual Regulation ("PSM's Manual") regarding non-reappointment states the following:

> The term "non-reappointment" means that PSM has decided not to renew an appointment at the conclusion of its term. **A major responsibility of PSM is to recruit and retain the best qualified faculty its means allow;**

---

[5]Plaintiff's denial is unsupported and inconsistent with his own deposition testimony.  As such, this statement is deemed admitted.

[6]Exhibits 7 and 8 of Plaintiff's Opposition (emails dated April 21, 2009 and May 4, 2009) do not contest this statement. Docket No. 37, Exhibits 7 and 8.  Similarly, Boileau's contention that he immediately submitted plans to the committed to try for future deadlines or other granting agencies, does not contest the fact that he failed to put together the entire grant by May 6, 2009.

[7]Again, and although Plaintiff denies this statement, his denial is belied by his own testimony.  When asked whether he generated any articles from your work at PSM in peer-reviewed publications, he answered:"[i]n peer-reviewed publications, no." Docket No. 28-4, Exhibit II at p. 135, lines 7-9.  He tries to minimize the importance of this requirement by arguing that nothing in this contract required him to publish papers related to his research at PSM and refers to one manuscript that was finally accepted in the Journal of Neuroscience *after* his agreement with PSM terminated.  Similarly, Plaintiff's contention that "[s]everal professors at PSM have no publications after 10 years," is nothing but disingenuous.  It is obvious that Plaintiff is not the right person to question the terms and conditions of PSM's employment contracts with other professors.

[8]Again, Plaintiff's denial of this statement is belied by his own deposition testimony.  Plaintiff's argument involving other professor's ability to obtain funding after several years is misplaced for the reasons previously explained.  See, fn.7.

Andre Boileau v. Ponce School of Medicine
Civil No. 12-1550 (JAG/CVR)
Report and Recommendation
Page 10

**therefore, wide latitude consistent with academic freedom and due process, is accorded to the President and Dean and the department chairs in making the decisions necessary to meet this responsibility**.

The initial decision not to reappoint a faculty member rests with the **chairperson of the department in which the faculty member serves. Such recommendations for non-reappointment must be approved by the dean for Academic Affairs and Dean for Faculty and Clinical Affairs, who submits a recommendation to the President and Dean for a final decision**.

Notice of non-reappointment of a member of the faculty must be given in writing on **or before March 31 of the academic year when services will terminate.** It is recommended that whenever possible the faculty should be made aware of the non-reappointment one year in advance.

Since a notice of **non-reappointment is not a dismissal for cause, it is not necessary for PSM to set forth the reasons for non-reappointment**. However, they **may** include, but are not necessarily limited to the following: cancellation of, or change in a program, declining enrollments, financial exigencies, over-staffing, lack of excellence in teaching, inadequate service to PSM and incongruence between interests of the faculty member and educational goals of PSM. (Emphasis added).

See PSM's Faculty Regulations Manual, Docket No. 28, Exhibit XII at p. 49.[9]

On September 21, 2009, Dr. Armstrong, Dean of Faculty and Clinical Affairs, sent Boileau a letter informing that, according to PSM's records, his initial appointment was to

---

[9]Plaintiff's blanket objection to this statement will be disregarded by the undersigned. Besides making a general allegation that PSM's reference to its Faculty Regulations Manual is a "legal contention" "is not supported by the record and/or cite to inadmissible evidence," Plaintiff provided absolutely no argument in support his objection. Therefore, the Court refuses "to do counsel's work, create the ossature for the argument, and put flesh on its bones . . . Judges are not expected to be mind-readers." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990); see also Ramírez-Lluveras v. Pagán-Cruz, 919 F.Supp. 2d 214, n. 6 (D.P.R. 2013). Moreover, Plaintiff challenges a document that he later uses in support of his breach of contract. See, Plaintiff's Opposition & Reply to Summary Judgment Statement of Genuine Facts Pursuant to U.S.D.C. P.R. Local Rule 56(c), Docket No. 36 at ¶ 50.

expire during the 2009-2010 school year and, that, pursuant to the Faculty Regulations Manual, he would be subject to evaluation by the President and Dean of the school prior to the renewal of his contract. SUM ¶ 49.

In addition, Armstrong's letter also informed Boileau that, as part of the evaluation process, he would be given an interview meeting with the Department Chair, the Dean of Faculty and Clinical Affairs, the Dean of Academic Affairs and the Budget Director.[10] SUM ¶ 50.

On or around October 2009, Boileau made efforts to seek employment elsewhere, including a University in China and Huxley Associates.[11] SUM ¶ 51.

In early December 2009, Dr. Armstrong contacted Dr. Torres, Associate Dean for Research and Graduate Studies, and Dr. Leon F. Ferder, Professor and Chair of the Department of Physiology and Pharmacology, so they could evaluate Boileau and a decision could be made as to whether Boileau would be re-appointed for another two-year term. SUM ¶ 52.

Dr. Armstrong requested that Dr. Torres and Dr. Ferder provide their feedback with regards to Boileau's execution of the three main areas of work detailed in his original appointment offer: teaching, administrative services and most importantly, research. SUM ¶ 53.

---

[10]Plaintiff's denial of this statement does not contest this fact.

[11]Again, Plaintiff's denial does not contest this fact. He only clarifies the purpose of those efforts, that is, to use the offer from another university as a bargaining chip. Thus, this statement is deemed admitted.

In essence, Dr. Torres and Dr. Ferder conveyed to Dr. Armstrong that, while Boileau had complied with his teaching requirements, he had not complied with his administrative services and research duties. Boileau had not made advances in his research; had not published any papers in peer-review journals relating to his work at PSM; had not obtained any external funding; had not been helpful to the administration of his department; and had failed to submit the RFIP grant proposal within the May 6, 2009 deadline.[12] SUM ¶ 54.

Thus, the recommendation from Dr. Ferder, as the Chair of the Physiology and Pharmacology Department, and from Dr. Torres, as Associate Dean for Research and Graduate Studies, was that Boileau should not be re-appointed to another two-year term. SUM ¶ 55.

With these evaluations and recommendations at hand, Dr. Armstrong proceeded to schedule an interview meeting with Boileau on December 7, 2009 to give him the opportunity to explain his progress and contributions to PSM during his two-year term. SUM ¶ 56.

Boileau was informed of the December 7, 2009 meeting the day before the meeting was to be held. SUM ¶ 57.

Aside from Dr. Armstrong and Boileau, the following persons were present during the December 7, 2009 meeting: Dr. Ferder, Dr. Olga Rodríguez de Arzola, Professor and Dean of Academic Affairs (hereinafter referred to as "Dr. Rodríguez"), and Ms. Aixa Ramos, Human Resources Official. SUM ¶ 58.

---

[12]Plaintiff's allegations does not contest this fact.

During the December 7, 2009 meeting, the following matters were discussed, among others: (I) Boileau's work as an Associate Professor at PSM; (ii) issues Boileau had with Francisco Puerta, a lab technician turned graduate student who worked in Boileau's laboratory until he was terminated; (iii) that one of Boileau's papers had been accepted for publication; (iv) that Boileau had issues lifting his program, due to economic reasons but that he hoped to obtain a grant following his paper's publication; (v) the RFIP grant and the reasons why it had not been submitted in time to meet the May 6, 2009 deadline; and (vi) that he had worked on grant proposals but had been unsuccessful. SUM ¶ 59.

At the conclusion of the meeting, Boileau was asked to generate a report of the work carried out while at PSM.  Said report was to also be discussed with Dr. Torres. SUM ¶ 60.

In addition, Dr. Armstrong requested a second meeting, which Boileau thought was a good idea. SUM ¶61.

Boileau submitted a report detailing his work at PSM and on December 15, 2009, Boileau once again met with Dr. Armstrong and Dr. Torres to discuss his work at PSM and the report he had prepared. SUM ¶ 62.

The December 15, 2009 meeting confirmed that Boileau: (I) had not published any papers in peer-review journals relating to his research during the time he was at PSM; (ii) had failed to seek out external funding while at PSM as he had only applied to a single grant in the two years he was at PSM, which he did not obtain; and (iii) had not been able to obtain and/or secure any external funding. SUM ¶ 63[13].

---

[13]See previous discussion regarding publishing and external funding. Additionally, Plaintiff is making a blanket objection to this statement without any additional argument in support his objection. The Court will not do counsel's work. United States v. Zannino, 895 F.2d at 17.

Dr. Armstrong also consulted with Dr. Rodríguez, and requested that she inform him as to whether she approved of the recommendations made by Dr. Torres and Dr. Ferder that Boileau not be reappointed to a second two-year term at PSM. Dr. Rodríguez approved the recommendations made by Dr. Ferder and Dr. Torres that Boileau should not be reappointed as he had not obtained external funding, failed to publish in peer-review journals, and did not comply with the terms of his initial appointment as Associate Professor and Director of the Neuroscience Center. SUM ¶ 64.

Following the December 15, 2009 meeting, Dr. Armstrong analyzed the recommendations of Dr. Ferder, Dr. Torres and Dr. Rodríguez, Boileau's report of his work while at PSM, and Boileau's interview meetings, and determined that Boileau should not be re-appointed to another two-year term at PSM. SUM ¶ 65. [14]

In particular, Dr. Armstrong considered the fact that Boileau had not secured external funding throughout his time at PSM; that he had not made any progress in his research; that he had failed to publish in peer-review journals; and that he had fumbled the school's application to the RFIP grant for the May 6, 2009 deadline. SUM ¶ 66.

Accordingly, Dr. Armstrong informed Dr. Joxel García, President and Dean of PSM, that after evaluating Boileau, those participating in the process did not recommend Boileau's reappointment to another two year term following the completion of his initial appointment, based on the fact that he had not satisfactorily complied with the terms of his initial appointment as Associate Professor and as Director of the Neuroscience Center. SUM ¶ 67.

---

[14] See, fn. 13.

On December 16, 2009, Dr. Joxel García sent Boileau a letter informing him that his appointment would not be renewed at the conclusion of its term on January 16, 2010. SUM ¶ 68.

The letter was received by Boileau on December 21, 2009. SUM ¶ 69.

Neither party disputes that PSM's Manual became a part of the valid employment contract. The parties dispute, however, whether or not PSM breached the employment contract and PSM's Manual when it refused to reappoint Boileau to another two (2) year term.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  Pursuant to the language of the rule, the moving party bears the two-fold burden of showing that there is "no genuine issue as to any material facts," and that he is "entitled to judgment as a matter of law." Vega-Rodríguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997).

After the moving party has satisfied this burden, the onus shifts to the resisting party to show that there still exists "a trial worthy issue as to some material fact." Cortés-Irizarry v. Corporación Insular, 111 F.3d 184, 187 (1st Cir. 1997).  A fact is deemed "material" if it potentially could affect the outcome of the suit.  Id.  Moreover, there will only be a "genuine" or "trial worthy" issue as to such a "material fact," "if a reasonable fact-finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." Id.

At all times during the consideration of a motion for summary judgment, the Court must examine the entire record "in the light most flattering to the non-movant and indulge all reasonable inferences in the party's favor." <u>Maldonado-Denis v. Castillo-Rodríguez</u>, 23 F.3d 576, 581 (1st Cir. 1994). There is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood . . . ." <u>Greenburg v. Puerto Rico Mar. Shipping Auth.</u>, 835 F.2d 932, 936 (1st Cir. 1987). In fact, "[o]nly if the record, viewed in [this] manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." <u>Cadle Co. v. Hayes</u>, 116 F.3d 957, 960 (1st Cir. 1997).

## ANALYSIS

The parties agree that Puerto Rico law governs the construction of Boileau's employment contract with PSM.

Under Puerto Rico law the principle of freedom of contract governs. Therefore, as Article 1207 of the Puerto Rico Civil Code provides, the contracting parties may "establish the clauses and conditions which they may deem advisable, provided they are not in contravention of law, morals or public order." P.R. Laws. Ann. tit. 31 § 3372. Consistent with said principle, "obligations arising from contracts have legal force between the contracting parties, and must be fulfilled in accordance with their stipulation." P.R. Laws. Ann. tit. 31 § 2994.

In this regard, Article 1233 of the Puerto Rico Civil Code provides that, "if the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations should be observed." P.R. Laws Ann. tit. 31 § 3471. When

interpreting contracts, the court must read contract provisions in relation to one another, giving unclear provisions the meaning which arises from considering all provisions together. P.R. Laws Ann. tit. 31 § 3475.  By doing so, the court should assign terms their common meanings, and any term having multiple meanings should be read in the sense that is most suitable to give it effect. P.R. Laws Ann. tit. 31 § 3474.

"Actions arising in contract seek fulfilment of promises agreed to by the contracting parties. Said actions arise from the obligations freely agreed to by the contracting parties and stem from a voluntary act or omission which results in the breach of a previously constituted obligation." Ocasio-Juarbe v. Eastern Airlines, Inc., 125 D.P.R. 410, 419 (1990) (citing Santiago Nieves v. A.C.A.A., 119 D.P.R. 711 (1987)).

In the case of an employment contract, internal company rules and regulations governing the rights and obligations of employees are considered part of the employment contract.  Selossee v. Fund. Educ. Ana G. Méndez, 122 D.P.R. 534 (1988).

Puerto Rico courts have recognized the importance of tenure and the uniqueness of the employment relationship between a university and a tenured faculty member. In Selosse, the Puerto Rico Supreme Court warned that:

> [t]enure in institutions of higher learning constitutes one of those circumstances where judicial review -- without abdicating our functions -- must be prudently exercised. This approach recognizes that these educational institutions perform an important social task and, thus, must be free from outside pressures and intervention. This deferential treatment is based on the fact that in the academic world, the faculty is highly specialized and much more experienced in the use of evaluation techniques. Thus, we prevent that courts sit as "Super Tenure Committees" lacking the necessary expertise.

> Id. at p. 547.  (internal citations omitted).

As PSM correctly asserts, federal courts have also held that a higher learning institutions' decisions as to whether to reappoint faculty should be afforded great deference by the federal judiciary and that courts should avoid acting as super tenure committees. See e.g. Villanueva v. Wellseley College, 930 F.2d 124, 128-129 (1st Cir. 1991). See also Wynne v. Tufts Univ. Sch. of Med., 932 F.2d 19, 25 (1st Cir.1991) (*en banc*) ("When judges are asked to review the substance of a genuinely academic decision, ... they should show great respect for the faculty's professional judgment.") (*quoting* Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985)).

In PSM's Motion for Summary Judgment, it alleges that Boileau fails to establish a cause of action for breach of contract, as PSM fulfilled all of its duties and responsibilities under the terms of Boileau's employment contract and complied with the non-reappointment procedure established in PSM's Manual. The undersigned agrees.

As the uncontested facts confirm, PSM and Boileau entered into a valid employment contract, pursuant to which Plaintiff was appointed to work as an Associate Professor in the Department of Psychology and Physiology for two (2) years, that is from January 2008 to January 2010. By virtue of the employment contract, Plaintiff was expected to publish regularly in well-recognized peer-review journals and actively seek **and obtain** external funding so that he could sustain his research activities. Boileau did neither.

The parties, however, agreed that if Boileau was unable to obtain additional income from grants by the end of the second year, PSM would be willing to offer a second two (2) year contract. The agreement *clearly* conditioned Boileau's reappointment upon the

recommendations of the Chair of the Department of Physiology/Pharmacology and the Associate Dean of Research. Thus, his employment at PSM was not guaranteed after the initial two (2) year term.

PSM fully complied with the non-reappointment procedure as the uncontested facts in this case show the initial recommendation not to reappoint Boileau was made by the Chairperson of the Physiology and Pharmacology Department; said recommendation was approved by the Dean Academic Affairs and the Dean for Faculty and Clinical Affairs who submitted the recommendation to PSM's President and Dean of the school who made the final decision not to reappoint Boileau. Furthermore, Boileau was given notices of his non-reappointment in writing before March 31st of the academic year in course, as required by Section 2.11.1 of PSM's Manual.[15]

Furthermore, although the parties engaged in negotiations as to the economic terms of the employment contract, it is uncontested that during the negotiations Boileau did not raise *any* objections as to the non-economic terms and conditions of the employment contract (including the section conditioning his reappointment upon the commendations of the Chair of the Department of Physiology and Pharmacology and by the Associate Dean of Research).

In a desperate attempt to save his claims, and without any clarity or reasoned argument, Plaintiff invites this court to consider his employment contract with PSM as an

---

[15]In a very confusing way, and contrary to Article 1233 of the Puerto Rico Civil Code, Plaintiff suggests that the termination notice in this case was not made in compliance with Section 2.11.1 as the term "academic year" should be interpreted according to an email communication attached to his opposition as Exhibit 16, as he had to "adhere" to the contract. (Docket No. 35 at p. 9-10). Plaintiff is wrong. Article 1233 of the Puerto Rico Civil Codes requires that courts enforce the literal sense of a written contract, when the terms of a contract are clear and leave not doubt as to the intentions of the contracting parties, like in this case. See, P.R. Laws Ann. tit. 31 § 3471. Moreover, this argument is belied by Plaintiff's own admissions regarding the negotiation process that preceded the execution of the employment contract.

"adhesion" contract as he "was the person at [sic] to adhere to the contract and his imperative [sic] to sections above." (Docket No. 35 at p. 5). As such, he further contends, the "interpretation of obscure stipulations [sic] of a contract must not favor the party occasioning the obscurity." Id. Plaintiff misses the mark.

Not only Plaintiff's argument makes little sense but it also ignores basic principles of contract interpretation under Puerto Rico law when, as in this case, the terms of a contract are clear and unambiguous.  This argument is also belied by his own admissions regarding the negotiation process that preceded the execution of the employment contract.

Similarly, Plaintiff's unsupported contention that several professors at PSM "have not funding after several years" and "have no publications after 10 years" (Docket No. 35 at p. 8) is also misplaced. First, Plaintiff is not the right person to question PSM's employment contracts with other professors and the terms and conditions of said agreements.  Furthermore, it is clear that Boileau failed to comply with the terms of **his** employment contract with PSM by failing to obtain any external funds or to publish any papers in peer-review journals.  These obligations, accepted by Boileau, were clear and unambiguous.

Plaintiff also alleges that PSM breached his employment contract because he was not provided with sufficient notice as to his non-reappointment.  Boileau contends that PSM was required to provide him with three (3) months notice as to the fact that he would not be reappointed to a second two (2) year term.  However, as correctly argued by PSM, Boileau has failed to indicate the rule, regulation or requirement that imposed upon PSM the duty to provide him with a three (3) month notice requirement.  His opposition to defendants Motion for Summary Judgement does not help either. (Docket No. 35 at p. 9,

referring to an email communication that "suggests that normally, regular faculty members are required to receive three (3) months notice prior to non-renewal"). The court need not tarry long here as it is clear that Plaintiff's allegation simply finds no support in the record and that PSM's regulation regarding non-reappointment was followed in this case.

In sum, faced with a Motion for Summary Judgment, Plaintiff failed to meet his burden to establish that there existed evidence creating a trial-worthy claim or material fact. As such, it is recommended that PSM's dismissal request of Plaintiff's claims for breach of contract be **GRANTED**.

Finally, and because Plaintiff's claim under Article 1802 is based on the same facts previously discussed and that only confirm that PSM complied with all its contractual obligations and that Plaintiff failed to fulfill his duties under the terms of the employment contract, is recommended that PSM's request to dismiss Plaintiff's torts claim under article 1802 of the Puerto Rico Civil Code be **GRANTED.** A simple reading of Plaintiff's Opposition confirms that he failed to address his cause of action under Article 1802 and identify any intentional or negligent act and/or omission by PSM which resulted in harm to Boileau.[16]

### CONCLUSION

In view of the foregoing, it is recommended that PSM's Motion for Summary Judgment (Docket No. 28) be **GRANTED**.

IT IS SO RECOMMENDED.

---

[16] Article 1802 of the Puerto Rico Civil Code provides that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done. Concurrent imprudence of the party aggrieved does not exempt from liability, but entails a reduction of the indemnity." P.R. Laws Ann. tit. 31 § 5141.

Andre Boileau v. Ponce School of Medicine
Civil No. 12-1550 (JAG/CVR)
Report and Recommendation
Page 22

The parties have fourteen (14) days to file any objections to this report and recommendation. Failure to file same within the specified time waives the right to appeal this report and recommendation.  Fed.R.Civ.P. 72(b)(2); Fed.R.Civ.P. 6(c)(1)(B) and Local Rule 72 (d), see also 28 U.S.C. § 636(b)(1).

In San Juan, Puerto Rico, this 19th of February of 2014.

                              s/CAMILLE L. VELEZ-RIVE
                              CAMILLE L. VELEZ-RIVE
                              UNITED STATES MAGISTRATE JUDGE